Case number 2533222 William Powell Company v. Ocean Marine Insurance Company, et al. Argument not to exceed 15 minutes to be shared by appellants. 15 minutes for appellee. Mr. Bruner, you may proceed for the appellant. Thank you. Good afternoon, Your Honors. My name is Joe Bruner, representing appellant the William Powell Company. I'll be addressing appellants' first and second issues presented relating to what we contend are the procedural errors made by the district court below when granting appellee Aviva Insurance Limited's motion to dismiss. The heart of the procedural issues here, Your Honors, is that the district court inverted the normal motion to dismiss standards in order to draw inferences against Powell instead of making them in Powell's favor. Our briefs discuss the Rule 12B6 standard at length, and Aviva's brief spends almost no time discussing it and doesn't really try to defend how the district court applied it, and I'll let the briefs speak for themselves on that point. Instead, Aviva asks this court to rule on its Rule 12B2 personal jurisdiction argument, even though the district court did not address it. But under either Rule 12B6 or Rule 12B2, the result would be the same, because in light of the posture of the case, before the district court, the applicable standards are almost identical. If I'm understanding your procedural argument correctly, it's that you assert you pled that General Accident issued the policy rather than the U.S. branch. Do I have that so far?  Okay. And then there was procedural fouls that led to the district court concluding the opposite. I thought that your receipt of policy coverage from Belvedere and Potomac flowed through the domestication agreement, which passed the liabilities of the U.S. branch onto the subsidiaries. So if that's true, how would you have recovered under the Belvedere policy and the post-1981 policies if it were General Accident that had issued the policy? What would have passed that would have allowed that to occur post-1981? Well, I think there was an attempted transfer of the liabilities, which Belvedere accepted in the litigation. But our position, which Mr. Parks will more fully discuss, is that the transfer did not relieve Aviva, which is the exact same company as General Accident, of its obligations on the policies. I have a question about 12B6 versus 12B2, because obviously under 12B2 there can be evidence. There should be evidence, right, depending on how you resolve it. I take it you wouldn't be able to consider the 12B2 evidence in the context of the 12B6? Yes, correct. Okay. The 12B2 argument is kind of strange to me. It just basically seems to be the merits argument in disguise. Is that how you view it? I think that's correct, but it's important to keep the procedural posture before the district court in mind, Your Honor. There was no discovery taken. There was no evidentiary hearing held, even though Powell asked for discovery and Aviva fought very hard and successfully against taking any. So in that posture, Powell's burden to plead and establish personal jurisdiction is relatively slight, as the magistrate judge's report and recommendation recognized. And in that context, the district court was required to view that evidence and the pleadings in the light most favorable to William Powell and not weigh the controverting assertions that Aviva raised. And our position, Your Honor, is that the district court did not do that and instead construed aspects of the policies in Aviva's favor. I see your time is kind of running out here, but what do you view as the district court's holding on that first and second issue? It's not clear to me in reading the opinion that the court concluded that the U.S. branch had issued the policy, right? But it didn't come out and say, and therefore Aviva is kind of off the hook on that issue. Aviva is off the hook because of the second issue or the third issue, whatever, however you want to call it. But is it a holding on the first issue, on the second issue that follows from the U.S. branch as issuer? I agree that the district court's opinion wasn't entirely clear on that point. Our position is that that's one of the issues with the opinion below, Your Honor, is that it's not entirely clear what the holding even was. Okay. Okay. Any questions? No. Okay, thank you. Thank you, Your Honors. May it please the Court. Edward Parks for Great American and the settling insurers that are in this case. I want to address some of the merits of Aviva's arguments because we think they fundamentally rely on a misunderstanding of both corporate law in Ohio, contract law, and insurance regulation. On the contract law, it's well established in Ohio, and that's the law. We're talking about Ohio or New York. There's no real choice of law argument in the briefs. It seems to me the district court kind of applied New York law. That's kind of where we are, isn't it? Well, I think it's a little different because I think what the court is saying, the court didn't address the actual merits of our claim against Aviva in the sense that did what the contractual restructuring they did. As a matter of Ohio law, do we still have a claim against them? What they focused on is we believe as a matter of New York law that this corporate restructuring bars you. That's how I interpret what the district court was saying. Now, we don't think it does, and I'll skip right to that issue. Well, I mean, that's kind of a merits finding, isn't it? We think so, yes. Right. That's an Ohio law. I mean, I'm sorry, that's a New York law issue. In the context of this case, I'm not saying, by the way, that it's definitely a New York law, but you guys haven't really argued that it's not New York. Well, what we said in our brief is we don't think that any of that that happened in New York matters because we think and we pled that General Laxman issued policies to Powell in Ohio and received approval from the Ohio Secretary of Insurance, and therefore, none of that really matters from our perspective. But we also think they're wrong. And the reason that we think they're wrong is because the way insurance regulation works, all it does is take the general contractual principles that all parties to a contract are subject to and then adds additional requirements for insurers. So one of those additional requirements generally is that insurance companies, domestic and foreign, are required to keep certain assets on file to pay claims. So most insurance regulators, New York, Ohio, Pennsylvania, everywhere, they say if you're going to do something to those funds, you're going to do a corporate restructuring and move those funds, you need permission to do so. But here's the important part. The approval to move funds, the approval to enter into a transaction doesn't have any effect on the policyholders. It does not cut off their rights. The highest courts of both Pennsylvania and New York, whichever one of those jurisdictions apply because they cited filings in both, has made that clear. I point to the Lafarge case in Pennsylvania and the ABN Ambrose case in New York. In fact, that case is particularly instructive because it's almost on all fours. In that case, you had an insurance company, MBIA. They were in a similar position to General Laxman. They had issued a bunch of policies. They had a bunch of liabilities coming down the road. And so they tried to cabin their liabilities by transferring their liabilities to one of their subsidiaries along with some assets, but arguably not enough. And they went to the state superintendent to get approval. This 51 statute, this domestication process, it's more like a merger, right? It's a merger of an entity that's not really a separate legal entity, so it's an odd to call it a merger. But it seems like the New York legislature was saying, we want these U.S. branches to be domesticated, and we're going to set up a situation where we merge, right? And in that kind of situation, the liabilities would just be assumed, subsumed by the new entity, and the previous entity would just go away, right? Well, I don't think it's a merger in that sense. It's a merger in the sense that the business is being merged with a new entity. But it's not a merger in the sense that it's intended to cut off claims against the original company, because that company still exists. And there's no statute that says otherwise. The kind of the contextual documents, the legislative evidence is interesting in this case. They're talking about unrest in Europe, and we're worried that these European companies are going to be insolvent or whatever happens. And it looks to me like the legislature is saying, we just want to cut Europe off completely from this. We're going to domesticate. You can domesticate this U.S. branch. We're going to allow you to do something that looks like a merger, even though you couldn't normally do this as a merger because it's not a sub, right? It's not a wholly owned sub or separate legal entity. We're going to call it a merger, essentially. They don't say that exactly. They'll say you assume the liabilities. Why doesn't that just take care of Europe? Europe is now gone. Because those protections were already in place. So the way the statute's set up, they created a trust for the exclusive benefit of the U.S.-based policyholders. That's what the purpose is. All this does is, like many insurance statutes, let them move that trust from one entity over to another and give sign-off on that, because that's one of the things regulators do look at. But there's nothing about that that is intended to insulate the foreign insurer. This whole statutory regime is designed to protect the policyholders. It's not designed to prevent. Right, but why does one of those documents say specifically, it's like, you know, normally you'd have to get the policyholders' consent to do this, but we don't. . . They basically say, but we're going to bypass that. That suggests to me that there's a novation of those contracts. What that document is referring to is not a transfer of the assets, the liabilities, but a transfer of the assets. Because normally, if you're going to transfer the funds outside of the entity to a new entity, you need permission from the policyholder in order to do so. That's what they're referring to. They're not saying that you have to . . . that that somehow gives an injunction, in essence, against the company with which they issued the coverage. Keep in mind that this approval process that's being done by the superintendent, there's no notice of that approval process. You can tell from the ABN Ambrose, they kind of discuss a similar process. They don't . . . there's no independent analysis by the superintendent. They just look at the information and give a yes or no. There's absolutely no due process, which is why the Court of Appeals, in the ABN Ambrose case, when they're dealing with a very similar situation, said, look, if we assume that the legislature was trying to do this, wouldn't we see something in the statute that provided some policyholder protections? Wouldn't we have some sort of notice procedure, an opportunity to be heard? And because that doesn't exist, the Court says, I'm not going to interpret it that way, and they allowed the claims to go forward. The Farge case in Pennsylvania, the same thing, except in LaFarge, there was a lot more public notice. In LaFarge, they gave public notice to everybody. They gave actual specific notice to the policyholders. They had a whole hearing. They were competing claims. That's how it goes on. Because what they're basically doing is saying, okay, is it enough to take these statutory reserves and transfer them to the other company? But the New York superintendent's not doing their own actuarial analysis. They're just relying on the truth of what's asserted. And without any sort of contested process, that can't be binding on the policyholders, and they still have a claim under state law to make the claim against the party that actually issued them a contract. Okay, I understand. Okay, what is your position, if any, on certification of any of these issues to the New York Court of Appeals? I still don't think the New York Court of Appeals issue matters on this, but, I mean, it certainly is something that could be decided in the first instance by New York. By what? I mean, we wouldn't object to New York, the case being certified to New York for ruling. Okay, thank you. Good afternoon. May it please the Court, John Hamill on behalf of Aviva. I want to be most responsive to the questions that I've already heard, and so I'd like to tackle some of them. But from our perspective, the case can be decided and affirmed on any one of three pretty clean paths. The first one is the statutory framework that exists in the state of New York as interpreted by the New York Court of Appeals. The second is the domestication issue, including the statutory framework for domestication. The third is the lack of personal jurisdiction, but I'll put that one aside. I did hear the question that came up before. I'll put that on the side for now. Let me try, if I may, to summarize our position as follows. At its heart, the case is governed by a statutory framework in New York that has existed for over 100 years. That architecture required GAFLAC's U.S. branch to maintain trustee assets, to be administered separately, and for all relevant purposes to have what the courts in New York call the separaturistic personality. If that's true, then how can the superintendent order the infusion of more cash into the trust from the alien insurer is my first question. My second question is, then why does the statute define the United States branch as business done by an alien insurer? We take them in that order. As to the first one, as I read the statute, what the superintendent has to do is actually go to the U.S. branch and have the U.S. branch work with the overseas entity to recapitalize. If they were separate entities, what right would the superintendent have to order the recapitalization of United States-based trust assets from a separate entity, in your view? I understand the distinction when you've chosen to operate a separate sub, as General Accident did through Potomac, but your argument, it seems to me, conflicts with the scheme insofar as the scheme is contemplating that ultimately it's the alien insurer's responsibility to ensure there's enough assets in the United States, not the U.S. branches. I think it's actually the superintendent's obligation to make sure that there are enough assets in the United States, and that's why there's the continuing jurisdiction in the annual submissions of the trustee assets. As I read the statute, still sticking on your first question, as I read the statute, it is the compulsion of the U.S. branch. Now, could the superintendent go and command the U.S. branch to do something, and if the U.S. branch doesn't do it, could the superintendent get on a plane and file something in Edinburgh? I suppose that's never been grappled with. But the statutory scheme puts the relationship between the superintendent and the U.S. branch. So I think that's the answer, and I think that probably covers both aspects of those questions, as I see it. But even beyond that, Your Honor, if we continue beyond that to the domestication point. I mean, doesn't the domestication point undermine your argument on the first point? It seems like there's tension in the arguments, because you're saying, the way I view it, it's domestication. The question is whether Aviv is off the hook after the domestication, right? I mean, the whole point of that, to put them off the hook, kind of implies that they were on the hook before, right? I mean, why would you have this domestication? Why would you say, hey, Europe, you're crazy right now. We don't want any part of you anymore. That implies to me that, hey, Europe, you were part of this thing before, right? I mean, at a minimum, I don't see how you can win both arguments. You're telling me I can't have my cake and eat it too. Well, I did make the move, but for that reason. No, I understand that, but I'm just saying, it just seems to me that the strong form of the second argument really undermines the first one. So if you were to ask me to rank the arguments, is there any wiggle room in that first point? Could I be wrong because of the language that both of Your Honors have cited? I don't think I'm wrong. I do think that when we look at the Stoddard case and the Moscow case, they do talk about this separate personality, looking at the U.S. assets, the U.S. liabilities. Yeah, but it's in a different – I mean, it's just in a different context. I mean, it doesn't make a lot of – I mean, yeah, okay, fine. We don't want to send our money overseas. All right, great. I mean, that's just not – that's not necessarily the same thing as saying that our people can't sue the – can't have another out card if they want it against a foreign entity. I was going to pick up there, but I – You know, the point of those cases as I read them is to protect U.S.-based policyholders by ensuring that the trust exists. It seems to flip the whole purpose of that statute on its head to say, well, actually, a general accident can hold itself out as having these liabilities as an – assets as an alien insurer contract with U.S. policyholders through its U.S. branch and then when something goes wrong say, you know, never mind, you are only limited to the trust assets. I don't see anything in the statutory text certainly to support that type of outcome. So let's stay there, and then we're going to go to domestication because I do think that's the next path to go to. Look at the Moscow case by way of example. So in the Moscow case, there is this kind of a battle between whether the assets are going to stay here stateside or whether Russia can essentially come and get the money back that was left over. In that case, there had been a liquidation of the U.S. branch. It was done, it was over, and there were still assets left over. Assets here, stateside, left over. And the question that comes up, do those assets that are left here stateside, do they stay here? There's no more policyholders whose interests have to be protected because it's done as an entity. And what the court says, the New York Court of Appeals says, is those assets stay here. They don't travel back overseas to the European entity. So that type of decision says to me, still sticking with argument number one, says to me that the courts really meant what they said, that there was a separate personality. And that's borne out by the statute. The argument flowed the other way in the Stoddard case, though, because the surplus assets from the trust then went back to the alien insurer overseas to fulfill whatever obligations there were to foreign policyholders. You run the asymmetry argument, which I guess I would say it's not necessarily asymmetrical because as a condition of running the U.S. branch, you create trusted funds that are for U.S. policyholders. So the fact that foreign entities can't come over and grab those out of a trust designed to protect U.S. policyholders doesn't necessarily seem like an aberrant outcome. But I'll let you go to domestication. Well, but we only have what the New York Court of Appeals has said, and we have the statutory text that conveyed that separation. So that's where we would harbor and anchor the first argument. But let's talk about domestication. I understood the reference to whether it's kind of like a merger. Of course, remember here there's both a domestication and a merger. But let's just stick with the basic concepts. When we look at Section 7201A, that's the lead-in to the domestication provision, it says that the domesticated entities, and this is the statutory text. This isn't an argument. This is what it says. Domesticated entities succeeds to all business and assets and assumes all liabilities. Assumes all liabilities. That's the word that's in the statute. All liabilities of such insurer. But normally if I assume someone else's liability, normally we are still both jointly and severally on the hook as a matter of general contract law. Do you agree with that? I do not. I don't think that's proper. Do you have a case for me from New York that says that? Because that's the way the common law works. I don't think there's been a dispute that I'm aware of of this domestication statute. I do think that this type of argument flows. I'm talking about the word assume. When I assume someone's liability, I'm talking about, yeah, okay, fine, I'm on the hook, but that doesn't mean you're not on the hook anymore either. And, by the way, if you're not on the hook anymore, that involves a third party, and that would involve a novation and consent, right? No. Not here. Not here. And I agree the way you phrased novation before. You agree that a common law would, though, right? I do think this statute does have an impact on the common law. That's correct. Well, it better, or else I don't think you have a great position. Whether we have a great position or not, I do agree with you that it is different than the common law. It's a statute, and the statute does the process that your Honor identified in questioning to counsel for the appellant. Are you aware of any other scheme in which a state regulator in one state can vitiate the contract between two parties in a different state without their notice, without their opportunity to be heard? Because I took that from ABN to be a big problem with a similar position that was advanced there, insofar as it was saying, you know, the superintendent would have some due process problems with just aggregating contractual rights between two parties that were never before the superintendent and without their notice. There's a lot to unpack there. When it comes to the domestication process, I do think this is a unique statutory scheme. I haven't seen others like it, but that's what it says. That's the law that was adopted by the New York legislature a hundred and something years ago. How could New York vitiate Ohio-based parties' contractual rights? Well, they didn't vitiate anything, right, because those contracts from the beginning were contained within a required U.S. branch. Now, we can have an academic debate over whether at the time, before the domestication, there is some dual contracting obligations. But there's not. Even before the domestication, here's what the law says. 10744 says the U.S. branch is the business unit through which business is, and here comes the key part, is transacted in the U.S. by an alien insurer, 10744. The assets and liabilities of such insurer within the United States, and liabilities. So even before domestication, there's no possibility of vitiating a contract right because that contract was with the U.S. branch. That's what it had to be under New York law, which nobody disputes is governing these questions. But still, I thought the premise of your domestication argument was that could be true, and the U.S. branch, by being domesticated, was effectuating, I guess, a statutory-based novation under which Potomac and the entity the U.S. branch merged into is assuming the liabilities without need to give notice to Powell or get the approval as you would otherwise have needed under common law to effectuate that type of novation. Well, by our domestication argument, I yielded to the question and the hypothetical as to whether there was something different between the period before and the period after. I don't think there's any difference between before and after, which raised the question of, well, then why do you need the domestication? And I think we can see from the historical context there was a need for domestication in probably any number of circumstances, which raises a critical question that comes out of Your Honor's question. Let's think about what would happen from the rule of law that Powell is asking the court to enter. What would happen if here today in 2025 or when your decision comes out in 2026, we now have a ruling that says, you know what? Domestication really didn't end these liabilities for the overseas branch. And, in fact, there's concurrent liability. It's been concurrent liability all the way back for decades, little did we know. Now, that's a decision that doesn't just impact the parties to this case. That is a very significant change in the law, or at least looks to me to be a big change in the law. It's certainly a big decision. And now we've had a century of this statute being in place with domestication after domestication after domestication. All of a sudden, we're looked at rampant market instability because the court has come out and said, you know what, you're all still on the hook for all these obligations going back centuries and centuries. So I do think it's a rare statute, this concept of a kind of statutory innovation, as Your Honor has phrased it. It is unusual, but that's what it is. And it went three times. We'll get to A, B, and M real. I know you left me that question. I don't understand the bargain then. Let's say there's this domestication statute, and we say these European companies, we're just unsure about them and the stability and all that stuff, so they're off the hook. Aren't the policyholders worse off? What did they get in this bargain? What are they getting in exchange for wetting the foreign entity off the hook? Why can't I just have, it's another deep pocket. Maybe I never need to use it. Or maybe we have a long-tail claim that nobody ever anticipated, and here we are, and somebody ran out of money, and we've got to go after somebody else. Yeah, I understand the question. I think the answer is that's what the law says. Now, you're asking me about a bargain that was made in New York legislature between the Senate in New York and the General Assembly. I have no idea what sort of backdoor bargain. I'm just asking you on the face of it. How were the policyholders better off? How are they not just worse off? In insurance law, that's odd to me that the policyholders would be made materially worse off by taking somebody that they could recover from and taking them off the table. It doesn't matter. Maybe they exist. Maybe they don't. Maybe the Soviet Union takes over half of Europe, or maybe they don't. If this insurance company still exists in Europe, and I have a long-tail claim, and I need to go over there, why would I take the arrow out of the quiver? I just don't get it.  Because for the most part, other than the Bedivere insolvency, which, as we said in the brief, that's an unfortunate event. But other than the Bedivere insolvency, this statute is designed to protect the policyholders because it requires this set of assets to be here. And the bargain is we, the New York legislature, is setting up a structure where we are having a separate entity here. You want to do business here. You've got to have the assets here. You've got to assume the liabilities here. And, yes, eventually you can domesticate and so forth. But you've got to have it all here. The only reason that policyholders are worse off here, in a statute that is plainly designed to protect them, the only reason they're worse off is because, you know what? In the ensuing period, after this domestication, something went wrong with Bedivere, and it wasn't able to cover its liabilities. And that, I submit, is a very rare thing. And it is unfortunate. It's unusual. Those things happen. That's why we have liquidation proceedings. That's why we have protections in bankruptcy and those sorts of things. But the statute and the text, as interpreted on both our first and second arguments, as interpreted by the New York courts, commands the outcome we're seeing. If it didn't, stick with domestication. If it didn't, then domestication would be meaningless. There would be no impact to it whatsoever if there could be concurrent liability. And this is not ABN-MRO. ABN-MRO was three months after that restructuring, and it was a direct attack, not a collateral attack in briefing, you know, 43 years later. It was three months after it. It was a direct attack on the restructuring. That is not this case. This case is a breach of contract case. It does not deal with a frontal attack on the domestication at all. There's some quibbling in the briefs, which I respectfully submit doesn't. Do you think, on that view, that Powell could have brought a fraudulent conveyance, breach of good faith and fair dealing, piercing the veil, all of those claims post-domestication in 1981, on the theory that General Accident is trying to offload its liabilities to a U.S. branch that has far too few assets to cover its exposure? I don't think it would have been possible at all in 1981, because we know that the assets caught the estate. The estate that was reviewed and approved by the process, by the New York superintendent of insurance back then, was sufficient. It had to be. Otherwise, the domestication couldn't have been approved. We can also see right now. So if the question is right now, they didn't ask to amend their complaint, and so that's a long way. But let's imagine a scenario where they went to – That argument sounded a lot like the exact argument that was rejected in ABN, insofar as the argument there was the approval by the superintendent of the transaction foreclosed any common law claims related to the transaction. If that's the argument, and that's why Powell couldn't have sued in 1981, that does seem to me to be in conflict with ABN. Well, two ways it's not. First, this is about a domestication. It's not a restructuring. And there had to be a review of the assets to make sure there were assets there to pay the potential claim. So that's a major distinction. Beyond that, we live in a world where we know what happened. And this is your question to counsel for the appellant at the beginning. For 20 years, we know that these claims were paid. So if we go back in time and we look at the world as it was 40-whatever years ago in 1982, 1981, when this thing is being reviewed, they plainly got it right. We know here we don't have to don blinders. We don't have to put our head in the sand. We know that there were enough assets to pay those claims for a long, long time. Now, did something go wrong thereafter? Did somehow it was Benevere not sufficiently monitored? I don't know the answer to that. It's not before the court. But that's how we can substantially distinguish this case from AB&M. Okay, Counselor.  I don't think there's any need to certify because I think the statute is clear. Assumes all liabilities. We would be certifying. I understand the question. And, again, I'd rather have my cake and eat it too. I'd rather you certify than reverse. But I don't think there's anything to certify because the language is crystal clear in the text. And, again, domestication has to have meaning.  All right. Thank you.   A few points. First, AB&M-ANDRO was not a collateral attack on the superintendent's decision. In fact, the court makes that clear because the policyholder there weren't challenging whether the superintendent made the right decision or not. They're saying it just didn't bind them in their respective claims. So it's not a collateral attack on the judgment. Second, we keep talking about, like, this domestication agreement. I want to put a little bit of context on that. When we filed our complaint, we referenced that we understood there was some sort of transaction that he won. We didn't know what it was. In the motion to dismiss, Aviva attached an unsigned version of that agreement. We then sought discovery about that. It was denied pending resolution in the motion to dismiss. A year later, Aviva came up with a signed version that's in the file. Whether that's a complete copy, we have no idea. There's no evidence of any sort of insurance approval. There's no correspondence that we have in the record with the insurance agency. We don't know what kind of hearing at all was performed by the insurance superintendent. All we know is they have a signed agreement that appears to have been filed somewhere. That's all we have. So that's another reason why I don't think this was an appropriate argument to make on a motion to dismiss. Well, do we know that there was a domestication transaction that occurred under New York law? Whether we have the actual agreement or the text of the agreement or not, if we look at the Federal Register and AMBES reports, can we take judicial notice that this happened? You don't seem to be disputing that it happened. I don't know whether it was approved. I don't dispute that they entered into that agreement. Whether they followed all the proper rules to get approval and went before the superintendent, I have no idea. If you look at the Federal Register, that's Potomac applying for a surety bond, and that's their description of what happened. AMBES is actually interesting. I do want to talk about that for a second because let's put this in context. In the 40s, 50s, and 60s when Powell was being issued these policies, it had a choice. You can see from the policy itself. It could pick global general accident fire insurance company or it could pick small D.C.-based Potomac. And then for years, every year, based on information from Aviva, from General Accident, they said, in essence, hey, we're General Accident. We have X dollars on account in trust for the exclusive benefit of U.S. policyholders. But if that's not enough, the full resources of our Scotland office are available, and here's what that is. And every year they put the exact amount that was there. And so they sell the policies to the global company. They do that year after year. And then in a transaction with no notice to Powell, they reverse that choice and say, you know, actually, your policyholder is not global Aviva. Your policyholder is D.C.-based Potomac, but don't worry. We threw some money there and you should be fine in the future. Can we just circle back to Deshaun Bandian's question? Do you think that we can or cannot take judicial notice of what's in the Federal Register with respect to the domestication agreement? Are you saying that what's there is not sufficient for us to draw any conclusion from it? I think what's in the Federal Registry accurately reflects what General Accident told the federal government, but it's not a finding of any sort. In other words, it's not necessarily true on its face. And the same is true with AMBEST. AMBEST just reports information that insurance companies give them. So all that information that was being provided to AMBEST came from Aviva, which is the other problem. What they're basically saying is they tricked Powell for years. They told it for years that they had the full assets of the huge Scotland company available to pay clients, but now they really didn't. And when they got sick of it and they saw asbestos claims coming down the road, kind of like NBIA did in the Ambro case, they were free to just dump those claims into a smaller subsidiary, stick their then-existing reserves in there to cover it, and wash their hands. For context, every insurance company in America with any sort of asbestos liability has increased their asbestos reserves multiple times over the past 25 years. Reserves are fluent. All it is is an actuarial analysis of how much they think they're going to pay. It's fluid. That's why there's a statute requiring the foreign insurer to continue to put money in, because sometimes that's required. I'm concerned about the interaction of your argument with the liquidation of U.S. trusts, and in particular, if we're talking about, say, New York law, I think it's 7405D, where it says if you're liquidating the business of a U.S. branch of an alien insurer, only the business assets of such U.S. branch are included in the liquidation. I'm concerned that your argument about suing Aviva directly is kind of circumventing the limits on the liquidation that might be occurring in Pennsylvania. Well, so all those liquidations, the liquidation is different for Potomac, because Potomac is a different company. But, like, with this particular case, and you're talking about the money that was set aside for the policyholders, all they're saying is that's all they have jurisdiction over. So New York only had jurisdiction over the funds that were required to be maintained in New York. And so they're saying they can't seize anybody else's assets, right? The other assets that you can see in the Stoddard case, those are for the other claimants, foreign claimants, U.S. claimants that got their policies overseas. So I think that's all that's saying in that statute. And then, I can't remember who said it, but someone pointed out that under common law, an assumption does not change the general idea that under common law, both sides are responsible. Well, that's how you're supposed to interpret statutes, too. When you look at statute, you don't interpret them in a way that would abrogate the common law if there's a reasonable interpretation of the statute that doesn't abrogate the common law. Our interpretation of the statute is all this did is provide an approval process in order to do the transaction. It didn't provide any special protection for Aviva, and all it does is authorize the transaction. And then, finally, on the ramification, I will make this point. If this is allowed, a lot of insurance companies are going to want to take care of it. If insurance companies, because there's lots of different merger statutes. They apply domestically as much as they do to foreign companies. If insurance companies can go, oh, I see this big problem where there's PFAS or hair relaxers or all sorts of problems coming down the line. I know I issued a bunch of policies. I'll just stick those policies in the subsidiaries, throw some reserves in there for the last 10, 15, 20 years, and I know I'm covered. I've capped my liability. I think, respectfully, that's going to happen a lot more, and I question whether that's really sound public policy protecting policyholders. Okay. Thank you, Counselor. Thank you both for your briefs and arguments. The case will be submitted.